UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **DAVID AYERS**, | ) | Case No. 1:04 CV 0133 |
| | ) | |
| Petitioner, | ) | Judge Kathleen M. O'Malley |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | OF MAGISTRATE JUDGE |
| **MARGARET BRADSHAW**, | ) | |
| | ) | |
| Respondent. | ) | Magistrate Judge James S. Gallas |

Cuyahoga Metropolitan Housing Authority's special police officer David Ayers (hereinafter "Ayers") was indicted by the Cuyahoga County Grand Jury on three counts stemming from the killing of Dorothy Brown: one count of aggravated murder in violation of Ohio Revised Code §2903.01; one count of aggravated burglary in violation of Ohio Revised Code §2911.11; and, one count of aggravated robbery in violation of Ohio Revised Code §2911.01.  (Respondent's Exhibit A).

Ayers' court-appointed attorneys, Tom Shaughnesssy and Charles Webster,  filed a pretrial motion to suppress statements made by Ayers (Respondent's Exhibit C), and then a supplemental motion to suppress.  (Respondent's Exhibit D).  A suppression hearing was held, after which the trial court denied both Ayers' motions to suppress.  On August 9, 2000, three months prior to trial, the trial court held a hearing regarding discovery.  Defense counsel moved the court to order the prosecutor to turn over all exculpatory evidence contained in his file or in possession of the Cleveland Police Department.  The trial court was satisfied that the prosecution

1:04 CV 0133                                2

had disclosed the proper discovery materials.  On the same date, the prosecutor revealed for the first time that Ayers, on the day he was arrested (March 14, 2000), had asked Cuyahoga Metropolitan Housing Authority (CMHA) Sergeant Christopher Jakub ("Jakub") that if he admitted he struck the victim, would they let him go.  Eight days later, on August 17, 2000, the court ordered Ayers to provide a hair, blood, and saliva sample to the prosecuting attorney. Ayers fully complied with this court order.   Pubic hair had been discovered on Mrs. Brown's body and in her mouth.  That hair was tested and the source was neither Mrs. Brown nor Ayers.

On November 20, 2000, the morning the trial was to begin, homicide detectives Michael Cipo and Denise Kovach (hereinafter "Cipo" and "Kovach") for the first time recalled they overheard the statement Ayers had made to Jakub on the day of his arrest, March 14, 2000. Because of the last minute nature of this revelation, the defense asked that Cipo and Kovach's testimony be suppressed; however, the judge denied this request.

After the jury was selected and shortly before opening statements on the morning of November 27, 2000, the State revealed for the first time that a jailhouse informant, Donald Hutchinson (hereinafter "Hutchinson") would testify that Ayers admitted to him that he killed Dorothy Brown.  The defense was allowed to *voir dire* Hutchinson on November, 28, 2000, and Hutchinson testified before the jury on December 4, 2000.

The case was given to the jury on December 6, 2000.  At one point during jury deliberations the jury indicated to the court that they were deadlocked, causing the court to give

1:04 CV 0133                                                   3

a *Howard* instruction.[1]  The jury return a guilty verdict on all counts on December 11, 2000.  *Id.*

at 5.  The appellant was sentenced to a term of twenty years to life on the aggravated murder

count, ten years on the aggravated burglary count, and ten years on the aggravated robbery count

each term to be served consecutively.  The appellant timely appealed the verdict and the sentence

of the trial court.

On September 12, 2002, the appellate court issued an opinion agreeing with Ayer's

thirteenth claim regarding the trial court's failure to sentence in compliance with state law.[2]

*State v. Ayers*, 2002 WL 31031675, 2002 - Ohio - 4773 (Ohio App. 8 Dist.).   In all other

respects, the appellate court denied Ayers' assignments of error and affirmed Ayers' conviction.

*Id.*  (Exhibit J, Case No. 79134).

Ayers, through counsel, timely appealed the appellate court's decision to the Ohio

Supreme Court.  On January 29, 2003, the Ohio Supreme Court denied leave to appeal and

dismissed the appeal as not involving any substantial constitutional question.  (*State v. Ayers*,

1424, 782 N.E.2d 78, 2003 - Ohio - 259 (Table 2003).  Ayers, then assisted by counsel in

January 2004, filed his application for writ of habeas corpus pursuant to 28 U.S.C. §2254.

---

[1] See *State v. Howard*, 42 Ohio St.2d 18, 537 N.E.2d 188 (1989); *State v. Brown*, 100 Ohio St.3d 51, 796 N.E.2d 506, 2003  - Ohio - 5059 (2003).

[2] On August 29, 2003, Ayers was re-sentenced by the Cuyahoga County Common Pleas Court to 20 years to life imprisonment on the  the aggravated murder convictions and to consecutive nine year terms of incarceration for the remaining convictions.

1:04 CV 0133                                        4

At the time Ayers filed his federal application, he had also initiated a simultaneous state appeal on October 3, 2003, which was assigned Case No. 83565.  (See Docket CR -00-388738-ZA, *State v. David Ayers*, http://cpdocket.cuyahogacounty.us/p).  This state appeal was dismissed and followed on October 29, 2004 by Ayers' state application for postconviction DNA testing (*Id.*).  The application was denied, but reversed on appeal.  See *State v. Ayers*, 2005 WL 3549183, 2005 - Ohio - 6972 (Ohio App. 8 Dist.).  The state appellate court found that the trial court had not engaged in the required analysis nor ordered the prosecuting attorney to prepare a report on any pertinent DNA samples. The matter was remanded to the trial court for action consistent with the governing statutes.  Ayers had uncovered from discovery that there had been other suspects and the DNA samples obtained from him did not match the DNA results from pubic hairs found in Mrs. Brown's mouth (on dislodged dentures) and on her body (See Application Brief in Supprt, pg. 3, 5).  Ayers maintained that the prosecutor's file revealed that the original suspects were two men from Primary HealthCare who demanded $700.00 to clean Mrs. Brown's apartment, and told her that they would take her to the bank to get the money.  The police were called but Mrs. Brown refused to talk.  Prior to her death Mrs. Brown had withdrawn $700 from her bank (*Id.*, pg. 5).

Another suspect, Darren Ward, had, according to Ayers, knocked on or broke through at least three apartment doors on the night of Mrs. Brown's murder.  This suspect had a sex offense history from 1990 where the victim was found with no pants on, as was Mrs. Brown (*Id.*, pg. 6).  Darren Ward's brother, Jerret Ward, also was a suspect linked also to apartment break-ins.  Both brothers accessed the apartment complex through their mother, who lived there.  According to

1:04 CV 0133                                    5

Ayers, the prosecutor's file disclosed that Jerret Ward told Detective Kovach that he had

information about the murder of Dorothy Brown. At that time Jerret had been arrested and was

awaiting transfer by U.S. Marshals. Detective Kovach did not respond. Ayers points out that

this incident followed his arrest for the murder. There appeared to have been a strong possibility

for a new trial resulting from Ayers' state post-conviction proceedings.

The appellate decision allowing DNA testing, however, has been recently overturned by

the Ohio Supreme Court. See *State v. Ayers*, 113 Ohio St.3d 180, 863 N.E.2d 598, 2007 - Ohio -

1385 (2007). Ayers has not been successful in endeavoring to obtain a new trial, and

consequently, the undersigned will commence to review Ayers' four grounds presented in his

application for federal habeas corpus.

### STATEMENT OF FACTS

The following findings made by the majority in the state appellate court decision are

presumed correct and Ayers has not presented "clear and convincing" evidence to rebut them.

See 28 U.S.C. §2254(e)(1); *Joshua v. DeWitt*, 341 F.3d 430, 436 (6th Cir. 2003).

> {¶ 2} The victim in this case, Dorothy Brown, was seventy-six years old
> at the time that she was murdered. The victim was a resident of the
> LaRonde apartment complex on Shaker Boulevard in Cleveland. The
> LaRonde apartment complex is a facility which was owned and managed
> by the Cuyahoga Metropolitan Housing Authority (CMHA) and which
> primarily serves elderly and disabled residents. The victim's body was
> discovered at approximately 2:45 p.m. on the afternoon of December 17,
> 1999 and showed signs of numerous serious injuries including a fractured
> skull, trauma to the brain, fractures of the face, a broken finger on each
> hand as well as multiple bruises and scrapes. The coroner's assistant who
> testified at trial stated that there were a total of 24-27 different wounds

enumerated in the autopsy report. Several of these wounds were characterized as defensive wounds, most likely received by the victim while trying to fend off an attacker. Although the victim was discovered nude from the waist down laying on the floor of her apartment, there were no signs that a sexual assault had occurred.

{¶ 3} There were signs of robbery at the scene, including the victim's emptied handbag which was found on the recliner where she was most likely sitting immediately prior to the assault, as well as an undetermined amount of cash which was known to be in the apartment which was missing. There were no signs of any forced entry into the victim's apartment such as a damaged doorjamb or pry marks in the vicinity of the doorway or the lock, although there was testimony that the door had been locked prior to the time of the assault.

{¶ 4} The appellant, although not elderly or disabled, was also a resident of the LaRonde apartments. The appellant was employed by CMHA as a special police officer (SPO), the function of which is to provide security at CMHA complexes. As part of his compensation for serving as an SPO, the appellant was permitted to live at the LaRonde apartments for a reduced rent of approximately $50 per month. This program was adopted by CMHA to provide additional security and law enforcement visibility at CMHA buildings.

{¶ 5} It is not disputed that the appellant knew the victim fairly well as the result of providing security in the building and that he had been in her apartment on several occasions prior to December 17, 1999. It is also not disputed that in the early morning hours of December 17, 1999, at approximately 2:00 a.m., the appellant, accompanied by another resident of the complex, went to the victim's apartment for the purpose of assisting her from off of the floor where she had fallen and had been unable to get up. This other resident was Sarah Harris, who the next afternoon discovered the victim's body when she went to check on the victim. At the time that Harris discovered the victim's body, the door to the victim's apartment was closed but not locked.

*2 {¶ 6} The Cleveland police were notified of the apparent homicide at 2:44 p.m. on December 17, 1999 and responded to the scene at approximately 3:13 p.m. At the time that law enforcement initially responded, the appellant was observed outside of the victim's unit on the fifth floor of the complex (the appellant lived on the first floor) with a group of other residents, as well as in the building lobby, in a highly agitated state. One of the officers who testified at trial stated that the

appellant was "bawling" sporadically in the lobby of the building during the time period in which police initially responded to the scene and that his hands were extremely shaky while answering questions.

{¶ 7} During the time period following December 17, 1999, investigators obtained the phone records of the victim and the appellant as well as several other individuals who had either made phone calls to or had received phone calls from either the victim or the appellant. The victim's phone records, as testified to by a custodian of the records for Ameritech at trial, showed that she had not made or received any phone calls between 6:00 p.m. on December 16th to 3:00 p.m on December 17th. This information was inconsistent with the testimony of several witnesses who testified at trial.

{¶ 8} The phone records relating to appellant's home phone showed that he received two phone calls from a Kenneth Smith on December 17th. The first phone call, which was made at 12:11 p.m., lasted approximately fifty-one seconds. The second phone call, which was made at 1:54 p.m., lasted for almost sixty-seven minutes. Smith testified at trial that the appellant told him about the murder of Ms. Brown during the course of these phone calls and that he seemed to be extremely upset. This testimony was significant because both of the phone calls were made prior to the time that the victim's body was discovered in her apartment and prior to the arrival of police officers on the scene.

{¶ 9} After the commencement of trial, the state learned of the identity of an additional witness. This witness, Donald Hutchinson, was an inmate at the Cuyahoga County Jail and had been assigned to the same pod as the appellant. Hutchinson testified that after initially denying responsibility for the crime, the appellant, after propositioning Hutchinson for oral sex and offering to give him a massage, confessed that he had in fact killed the victim. According to Hutchinson's testimony, the appellant told him that he returned to the victim's unit in the early morning hours of December 17, 1999 with the intention of stealing money from the victim. Hutchinson further stated that the appellant told him that he killed the victim when she woke up and threatened to turn him in for being in her apartment and for stealing the money. According to Hutchinson, the appellant told him that the murder weapon was a small, black iron that was located in the vicinity of the recliner where the victim was positioned.

*3 {¶ 10} During the relevant time period in question, Hutchinson was in prison on charges of passing bad checks and for a probation violation arising out of additional incidents of financial misconduct, theft and

1:04 CV 0133                                    8

> dishonesty. Hutchinson's entire criminal history, as well his possible
> motivations for testifying, were placed before the jury both on direct and
> cross-examination.

> *State v. Ayers* 2002 WL 31031675, *1 -3.

*Analysis:*

Federal habeas is "an extraordinary remedy and 'will not be allowed to do service for an appeal.'" *Bousley v. U.S.*, 523 U.S. 614, 621, 118 S.Ct.1604, 140 L.Ed.2d 828 (1998), quoting *Reed v. Farley*, 592 U.S. 339, 354, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994).  For purposes of federal collateral review, all claims adjudicated on their merits by state courts are governed by 28 U.S.C. §2254(d)(1) and (2).  A district court has very restricted Congressionally granted powers for review under 28 U.S.C. §2254(d).  See *Williams v. Taylor*, 529 U.S. 362, 402-03, 117 S.Ct. 1495, 146 L.Ed.2d 389 (2000)*; Bell v. Cone*, 535 U.S. 685, 122 S.Ct. 1843, 1852, 152 L.Ed.2d 914 (2002).  The extent of permissible federal review of state convictions is limited as follows:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect
> to any claim that was adjudicated on the merits in State court proceedings
> unless the adjudication of the claim  - - -
>
> (1) resulted in a decision that was *contrary to*, or involved an
> *unreasonable application* of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination
> of the facts in light of the evidence presented in the State court proceeding
> (emphasis supplied).

The phrases "contrary to" and "unreasonable application" are not the same.  *Lockyer v. Andrade*, 538 U.S. 63, 75-76, 123 S.Ct. 1166, 1175, 155 L.Ed.2d 144 (2003).   Under the

1:04 CV 0133                                9

"contrary to" standard of review, the state court's decision is "contrary to" clearly established

federal law when it "confronts a set of facts that are materially indistinguishable from a decision

of [the Supreme Court] and nevertheless arrives at a result different from [this] precedent."

*Williams v. Taylor*, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Mitchell v.*

*Esparza*, 540 U.S. 12, 15, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003).  Under those circumstances

the Supreme Court has held that the federal court on habeas review may grant the writ.  *Id.*  The

phrase "clearly established Federal law" refers to holdings, as opposed to *dicta,* of the U.S.

Supreme Court at the time of the relevant state court decision.  *Lockyer*, 538 U.S. at 71-72, 123

S.Ct. at 1172; *Williams v. Taylor*, 529 U.S. at 412; *Bell v. Cone*, 535 U.S. at 698.


        Under the "unreasonable application" standard, "the state court identifies the correct

governing legal rule from [the Supreme] Court's decisions but unreasonably applies that

principle to the facts of the prisoner's case."  *Williams*, 529 U.S. at 413; *Wiggins v. Smith*, 539

U.S. 510, 520-21, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003).  This includes both the state

court's refusal to extend and its unreasonable extension of existing legal principles from

Supreme Court precedent to new contexts.  See *Williams*, 529 U.S. at 407.  The unreasonable

application of Supreme Court precedent must, however,  be "objectively" unreasonable.  *Id.,* 529

U.S. at 409, 120 S.Ct. at 1521; *Wiggins, supra*, at 520-21.  When the state court has rendered a

decision, the federal reviewing court  may not grant the writ in its "independent review of the

legal question."  *Lockyer v. Andrade*, 538 U.S. 63, 75, 123 S.Ct. 1166, 1175, 155 L.Ed.2d 144

(2003).

1:04 CV 0133                              10

Judge Ann L. Kilbane wrote a vigorous, persuasive and compelling concurring and dissenting opinion to the state appellate court's affirmance, concluding that Ayers had been denied a fair trial. *Ayers*, 2002 WL 31031675, at *12-33. This dissenting view was firmly grounded on the appropriate constitutional principles in reaching its conclusion. Federal collateral review, surprisingly though, is not to resolve which decision is more correct. Federal collateral review's purpose is to determine whether the majority's decision was "contrary to" or an "unreasonable application" of clearly established federal law; or was an unreasonable determination of the facts, as explained above. Under this lenient standard, for the following reasons, the majority's decision was not "contrary to" nor "unreasonable" under the Congressionally imposed restrictions, nor was the decision based upon an unreasonable determination of the facts. As a result, granting the writ would be beyond the court's authority and for the reasons that follow, the writ should not be granted.


**GROUND 1:**

  1.  The Petitioner remains in custody in violation of the United States Constitution because the prosecuting attorney willfully withheld exculpatory evidence from the defense.

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). See also, *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Ayers first claim is very broad, but in his traverse (ECF #31) Ayers

1:04 CV 0133                                   11

narrows his argument to the revelation of Detectives Cipo and Kovach's testimony on the day of trial and the revelation of the Ward brothers as suspects.

In *Brady*, the duty on the part of the prosecution to disclose material evidence whether or not requested by the defense is emphasized.  This includes both exculpatory and impeachment evidence.  *United States v. Bagley*, 473 U.S. 667, 676 (1985).  Thus, evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Kyles v. Whitley*, 514 U.S. 419, 433-434 (1995). The prosecutor has an affirmative duty to disclose any favorable evidence that may be known by anyone working on the case for the government, including police and investigators.  *Id.* at 437.

There are three components for petitioner to establish a *Brady* violation:

> 1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching;

> 2) the evidence must have been suppressed by the State, either willfully or inadvertently; and

> 3) prejudice must have ensued.

In order to obtain relief for a *Brady* violation, a petitioner must satisfy all three requirements.  *Strickler v. Green*, 527 U.S. 263, 263-264 (1999).

*Ward Brothers:*

With regard to the Ward brothers, the state appellate court found no *Brady*-violation,

1:04 CV 0133                                    12

explaining as follows:

[¶15] The record fails to support the appellant's assertions either that any exculpatory evidence existed in connection with either Darren Ward or Jerret Ward, whom the appellant maintains should have been considered suspects, or that any such 'exculpatory' evidence was ever wrongfully withheld.  Additionally, the record demonstrates that the appellant's trial attorneys learned of the alleged exculpatory evidence prior to trial and were able to question relevant witnesses concerning the alleged activities of Darren and Jerret Ward.

[¶16] Essentially, the appellant alleges in these assignments of error that it was error for the state not to divulge that the investigating officers had followed up on some leads concerning the Wards because one of them had a sexual offense conviction in 1990 and there were complaints that the two men had been breaking into units throughout the building.

[¶17] The allegation that Darren Ward's prior sexual offense conviction was 'exculpatory' evidence in the instant case is a complete red herring as the assistant coroner who performed the autopsy on the victim testified that there was no evidence of any sexual assault, and there was no other testimony or evidence at trial on this issue.

. . .

[¶24] As to the rumors that one or both of the Wards were breaking into tenants' apartments, the manager of the apartment building, Nefertiti Diggs, testified that she had been assigned to the LaRonde apartment building since April of 1999 and there had been no complaints of break-ins committed by these two persons from the time that she was hired until the time that the victim was murdered.  On cross-examination, Ms. Diggs was specifically asked by defense counsel whether she was aware of any complaints concerning Darren Ward or his brother and whether she had contacted authorities in connection therewith.  Ms. Diggs responded 'no because * * * it happened before I came.  I heard about it once I got there.'

[¶25] Prior to trial, the trial court ordered that the prosecutor's file be made part of the record in response to some questions concerning the alleged failure of one or more officers to disclose an alleged incriminating statement made by the appellant.  It was from a review of this file that the existence of the purported exculpatory evidence concerning the Wards was first learned of by defense counsel.  This court has also reviewed the subject file and in so doing has concluded that the information concerning

1:04 CV 0133                                    13

the Wards was fully followed up by the investigating detectives and
determined to be without merit.  Darren Ward was interviewed by
homicide detectives on February 23, 2000 and subsequently ruled out as a
suspect.

[¶26] In *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10
L.Ed.2d 215, the United States Supreme Court held that the state provide
favorable evidence to a defendant which is material either to his guilt or to
his punishment.  The proper test for materiality is whether the result of the
proceeding would have been different had the evidence been disclosed to
the defense.  *United States v. Bagley* (1985), 473 U.S. 667, 105 S.Ct.
3375, 87 L.Ed.2d 481.  This court does not believe that the state was
obligated to provide information concerning the Wards' status as suspects
as it was neither material nor exculpatory.  A defendant does not have the
right to the names of those persons whom the state at one time considered
to be suspects.  *State v. Spirko* (1991), 59 Ohio St.3d 1, 26, 570 N.E.2d
229; Crim. R. 16(B)(2).

[¶27] In this case, the evidence allegedly not disclosed was presented prior
to trial and was fully explored by defense counsel.  Accordingly, there is
no *Brady* violation herein.  *State v. Green* (2000), 90 Ohio St.3d 352, 372,
738 N.E.2d 1208.

*Ayers*, 2002 WL 31031675, at *3-*5.


        Ayers has not demonstrated that the state decision finding no violation of this aspect of

due process was "contrary to" nor an "unreasonable application" of  *Brady* and its progeny

regarding turning over files concerning Darren Ward or his brother Jerret Ward. To begin this

discussion, it is necessary to point out that the United States Supreme Court has never adopted

the defense's contention that one has a constitutional right to a complete and detailed account of

police information regarding "possible suspects." See *Moore v. Illinois*, 408 U.S. 786, 795,

(1972). Rather, the Supreme Court has emphasized the court must determine whether such

evidence would be deemed "material" to the determination of guilt or innocence.  *Id.*

1:04 CV 0133                                    14

The state appellate court decided the case without reference to *Moore v. Illinois*, but did refer to *Brady* and materiality in its decision.  Although the state court decision did incorporate *Brady,* as the dissenting decision pointed out, however, the majority decision misstated the definition of materiality as "whether the result of the proceeding would have been different" rather than whether there was a "reasonable probability" that the result would have been different.  *Ayers*, 2002 WL 31031675 ¶¶26, 122.  See *Kyles v. Whitley*, 514 U.S. at 434, 115 S.Ct. at 1565 ("Bagley's touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important").  The state decision was also grounded on an inappropriate rule that the State has no obligation to disclose to the defense, police reports and investigative materials concerning prior suspects with dubious citation to *State v. Spirko*, 59 Ohio St.3d 1, 26 (1991).  In *Spirko* the Ohio Supreme Court did not address a claim of constitutional violation and there is no mention of any pertinent U.S. Supreme Court decision.  Rather the matter was decided based on Ohio Crim. R. 16(B)(2).  Consequently, the state court decision's reliance on *State v. Spirko*, was misplaced.[3]  Nonetheless, the alternate grounds provided by the majority for rejecting the *Brady* claim were prior disclosure and lack of materiality (See *Ayers* ¶11, 26).

The state court decision, nevertheless, did refer to an appropriate decisional basis (*Brady v. Maryland*) from the Supreme Court which is sufficient to trigger a presumption that "state

---

[3] Subsequent to the state appellate court's decision in *Ayers*, the denial of federal habeas corpus was affirmed in *Spirko v. Brady*, 368 F.3d 603 (6th Cir. 2004) with respect to the unambiguous assertion of a challenge to the fairness of trial due to the failure to disclose evidence regarding alleged accomplice in violation of the *Brady* rule.

1:04 CV 0133                                    15

courts know and follow the law." *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S.Ct. 357, 360,

154 L.Ed.2d 279 (2002).  "§2254(d) requires that 'state court decisions to be given the benefit of

the doubt.'".  *Holland v. Jackson*, 542 U.S. 649, 654, 124 S.Ct. 2736, 2739, 159 L.Ed.2d 683

(2004), quoting *Visciotti*, U.S. at 24, S.Ct. at 360. Accordingly, since the state decision

acknowledged the correct factors for adjudicating this claim, Ayers must show an unreasonable

application of clearly established federal law.


        The first part of the state appellate court decision that this evidence was not exculpatory

was an unreasonable application of Supreme Court precedent.  Obviously, evidence that

someone else may have committed the crimes has exculpatory value.  However, Ayers did not

establish that this information had not been divulged, *i.e.*, the second *Strickler* component. The

state decision found that this evidence had been explored by defense counsel.  It follows that if

there was no suppression – then there was no due process violation.  Ayers refers the court to

TR. I at 188-89.[4]  There the prosecutor states that Darren Ward's name was on the witness list

and further that in April 2000 defense counsel was "told" of the allegation that he was breaking

into apartments.  This, however, serves to reinforce the state court decision that this information

had been disclosed to defense counsel.  Ayers contends, however, defense counsel was not told

of Darren Ward's criminal history, specifically the 1990 sex crime conviction (See TR. I at 192).


        A point made from *Spirko v. Mitchell,* was that "*Brady* does not grant broad discovery

_____

        [4] The brief actually identifies the quoted provisions as appearing on page 190.

1:04 CV 0133                                    16

powers to defendant" and that "where exculpatory information is not only available to the

defendant but also lies in a source where a reasonable defendant would have looked, a defendant

is not entitled to the *Brady* doctrine." *Spirko*, 368 F.3d at 609, 610, with citation to *Bagley*, 473

U.S. at 675 and *U.S. v. Wilson*, 901 F.2d 378, 380 (4th Cir. 1990). It is irrefuted that defense

counsel was "told" of Darren Ward's involvement in break-ins and defense counsel certainly

could have looked into this individual's criminal history which is a matter of public record.[5]


Ultimately, however, materiality/prejudice must be gauged by whether Mr. Hutchinson's

testimony about Ayers' statement against interest was properly admitted. Material evidence has

the reasonable probability of throwing the convictions into doubt. See *Moore, supra*; *Esparza v.

Mitchell*, 310 F.3d 414, 423-24 (6th Cir. 2002), rev. on other grounds, 540 U.S. 12 (2004).

After all the mere fact that Darren Ward was a suspect would not have a reasonable probability

of undermining Ayers' confession.[6]


With regard to the accusations about Jerret Ward breaking into tenants' apartments, the

state court decision relied on the manager of the apartment building, Nefertiti Diggs, who

testified that she had been assigned to the LaRonde apartment building since April of 1999 and

---

[5] The dissenting opinion concedes that Darren Ward's prior conviction for gross sexual imposition was a matter of public record. *Ayers*, ¶124 n. 18.

[6] The majority acknowledges that a pubic hair was found in Mrs. Brown's mouth, but concludes that since there was no evidence of vaginal or rectal trauma there was no evidence consistent with sexual assault or rape. See *Ayers*, ¶17-23. This unquestionably is an unreasonable conclusion based on the facts. "Sexual Conduct" is defined to include ". . . fellatio and cunnilingus between persons regardless of sex." Ohio Rev. Code §2907.01(A)(1) (Lexis/Nexis 2003) and current version of §2907.01(A)(1) in 2007 Supplement). Apparently only that court did not believe that sexual conduct excluded oral activities. Nonetheless, this erroneous rationale should not detract from Ayers' failure to establish materiality.

1:04 CV 0133                                          17

there had been no complaints of break-ins committed by these two men from the time she was

hired until Dorothy Brown's murder.  (Tr. 968).  Diggs heard rumors about the Ward brothers

breaking into apartments prior to her employment at LaRonde; however, there were no reports of

such crimes in the months leading up to Brown's murder. *Id*.  *Ayers*, ¶24.  Ayers' argument

based on the tenant "Pratt's" statement concerned only Darren.  (See Traverse, pg. 5-6).

        As for Jerret Ward's attempt to contact Detective Kovach about the murder, the majority

opinion ignores this argument, although the dissenting opinion does address it.  See *Ayers*, ¶127

n. 19.  In such circumstances, the district court has no state court decision before it and must

resolve the issue *de novo*.[7]

        As an understatement, it is certainly odd for local law enforcement to assume the roles of

the three Confucion monkeys when an additional lead on a crime was known, and granted this

does suggest that the Cleveland police had an agenda to target Ayers for the crimes.  However in

itself, that evidence and reasonable inferences drawn from it are neither exculpatory nor material

to the determination of guilt or would it serve to impeach.  Ayers is presuming that one Ward

brother would implicate the other and not Ayers.  The materiality/prejudice aspect is clearly

negated by Hutchinson's testimony concerning Ayers' admissions.  Ayers recourse would have

been to attempt to contact this Ward brother and move for new trial under Ohio R. Crim P.

---

[7] See  *Howard v. Bouchard*, 405 F.3d 459, 467 (6th Cir. 2005), *cert. denied*, 126 S.Ct. 1032 (2006); *Moldonado v. Wilson*, 416 F.3d 470, 476 (6th Cir. 2005); *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003); *McKenzie v. Smith*, 326 F.3d 721, 726-27 (6th Cir. 2003), *cert. denied*, 540 U.S. 1158 (2004); *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000), *cert. denied*, 532 U.S. 947 (2001); and see *Wiggins v. Smith*, 539 U.S. 510, 534, 123 S.Ct. 2527, 2542, 156 L.Ed.2d 471 (2003).

1:04 CV 0133                                           18

33(B), if in fact he would implicate someone other than Ayers.


*Detectives Cipo and Kovach:*

Next Ayers claims that Detectives Cipo's and Kovach's tardy revelation of Ayers making

an "incriminating" statement , "if I tell you I beat her can I go home" was a *Brady* violation.  See

*Ayers*, ¶34.  The two homicide detective's statements were not exculpatory evidence, however,

or useful for impeachment.  The state court decision found that since the defense was already

aware that Ayers reportedly gave a nearly identical statement to Sergeant Jakubs, the defense

was already on notice that such an incriminating statement had been purportedly made by the

defendant.  This claim was not addressed in the majority decision as a *Brady* violation.  *Ayers*

¶¶33-40.  This naturally followed from Ayers' own argument to the state appellate court that the

evidence was incriminating, not exculpatory (Appellant's Brief pg. 21, Ex. H (ECF #14).

Further, this claim was not presented as a *Brady* violation to the Ohio Supreme Court.  (See

Memo in Support, 2002 WL 32593179, at *9).  It is unnecessary to proceed through the judicial

gymnastics of whether a procedural default has occurred or to determine the appropriate standard

of federal review.  The fact that Ayers had conceded that these statements were "inculpatory" in

briefing this argument to the state courts is sufficient to navigate around any potential violation

of *Brady* and its progeny.


**GROUND 2:**

2. The Petitioner remains in custody in violation of the United States
Constitution because the Prosecuting Attorney engaged in prohibited
closing argument, willfully suppressed incriminating statements made to
police and evidence from the petitioner's Defense, and obtained a

purported confession from Mr. Ayers on the eve of the trial through an
agent of the state after counsel was provided to Mr. Ayers, all of which
constitute prosecutorial misconduct.

In regard to Ayers' second grounds for relief alleging the prosecutor made an improper

statement during the closing arguments, the state appellate court determined that defense counsel

failed to object and thus waived all but plain error, citing *State v. Hartman*, 93 Ohio St.3d 274,

282 (2001); *Ayers*, ¶¶ 41-42.  The prosecutor had argued that Hutchinson's testimony was

credible, because like the jurors, Hutchinson had not heard about Ayers' case in the media,

stating:

> Mr. Hutchinson said, 'I didn't see any photographs, I didn't see them in
> my cell, I didn't see them from David's cell, I didn't read the paper, I
> didn't know about it on TV.  ***We asked you folks if you heard about this.
> And other than one person who indicated they might have, none of you
> saw it on TV or in the papers,*** [Mr. Ayers] case is] not front page news of
> the New York Times.  So where did he get all this information, folks?

Respondent relies on the procedural default that arises when the state court rests its

decision on plain error review.  The state appellate court clearly applied state plain error review

and found no manifest miscarriage of justice, hence no plain error.  *Ayers*, ¶42.


Ohio's contemporaneous objection rule is an adequate and independent state ground and

a defendant who fails to object waives review of the issue.  See *State v. Smith*, 89 Ohio St.3d

323, 731 N.E.2d 645 (2000); *Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006); *Williams v.

Bagley*, 380 F.3d 932, 967-68 (6th Cir. 2004); *Scott v. Mitchell*, 209 F.3d 854, 866-68 (6th Cir.

2000).[8]  Subsequent plain error review by Ohio state courts does not waive this procedural

---

[8] Additionally, the Sixth Circuit has recently reiterated that in "*Mason v. Mitchell*, most notably, the court
began its prosecutorial-misconduct analysis by 'first not[ing] previous holding 'that Ohio's contemporaneous
objection rule constitutes an adequate and independent state ground that bars federal habeas review absent a showing

1:04 CV 0133                                    20

default.  See *Keith*, 455 F.3d at 673; *Williams*, 300 F.3d at 968-69.  *Seymour v. Walker*, 224 F.3d

542, 547 (6th Cir. 2000).   The subsequent unexplained denial of appeal from the Ohio Supreme

Court rests on the same procedural ground.  See *Ylst v. Nunnemaker*, 501 U.S. 797, 111 S.Ct.

2590, 115 L.Ed.2d 706 (1991); *Levine v. Torvik*, 986 F.2d 1506, 1527 n. 8 (6th Cir. 1993), *cert.*

*denied*, 509 U.S. 907 (1993) overruled on other grounds in *Thompson v. Keohane*, 516 U.S. 99

(1995).  Absent cause and prejudice or miscarriage of justice, the reviewing federal court cannot

reach the merits of the claim.  *Reed v. Farley*, 512 U.S. 339, 354-55, 114 S.Ct. 2291, 129

L.Ed.2d 277 (1994).  Respondent raised this defense appropriately in the return of writ (Return

pg. 16) and Ayers did not attempt to counter with a demonstration of cause, prejudice or actual

innocence.  Consequently federal review is foreclosed.


**GROUND 3:**

> 3.  The Petitioner's Sixth Amendment Right to Counsel was violated by the
> State of Ohio when the trial court allowed the testimony of the State's
> agent who obtained a purported confession from Mr. Ayers on the eve of
> the trial after counselor was appointed to the petitioner.

The focus of this ground for relief is the testimony given by Mr. Hutchinson, a fellow

inmate in Ayers' pod.  Ayers contends that Hutchinson became a state agent after meeting with

the Cleveland Police homicide detectives on the evening of November 25, 2000, and that the state

trial court improperly denied the defense's motion to suppress Ayers' confession to Hutchinson.

(Tr. 844).  The state appellate court majority decision on this argument succinctly addressed this

---

of cause and prejudice.'  320 F.3d 604, 635 (6th Cir. 2003) (quoting *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir.
2001))."  *Nields v. Bradshaw*, 482 F.3d 442 (6th Cir. 2007).

1:04 CV 0133                                              21

issue without considering any of the U.S. Supreme Court's standards of review:

> The appellant concedes in the portion of his appellate brief devoted to this assignment of error that he has no evidence that Donald Hutchinson was 'instructed' by the state 'to obtain a confession from the appellant.' Appellant's appellate counsel states in the brief filed with this court that '[a]lthough the Public Defender has yet to prove that Hutchinson was initially deliberately placed in Mr. Ayers' pod he was certainly 'set on his course' by Cipo and Kovach at approximately 5:00 p.m. November 25, 2000.'  There is absolutely no evidence in the record to support this contention that Hutchinson was instructed by Detectives Cipo and Kovach to ask certain questions of the appellant in an attempt to elicit a confession. Hutchinson, Cipo and Kovach each expressly testified that no such instructions were ever given.  Hutchinson further stated that he was not the instigator of his conversations with the appellant and that the appellant freely and openly volunteered the information testified to by Hutchinson.
>
> This court is obligated to limit its scope of review to those facts actually contained in the record and must accordingly decline appellant's counsel's invitation to engage in unfounded speculation and conjecture as to what 'instructions' may have been given to Hutchinson.  Accordingly, the assignment of error is overruled.

*Ayers*, ¶¶45-46.

The substance of Hutchinson's story is that he met Ayers in the county jail while Ayers was conducting a Bible study group.  Initially, Ayers denied killing Dorothy Brown or, in fact, ever being in Mrs. Brown's apartment during the early morning of the day of her murder.  (Tr. 790).  After a few weeks in jail, Ayers changed his story and admitted that he was in Brown's apartment in the early morning on the day that she was murdered.  (Tr. 802).  Prompted by Hutchinson citing scripture from the Bible dealing with the confession of sins, Ayers admitted murdering Mrs. Brown.  (Tr. 1310).

The dissenting state appellate court opinion found infringement of the Sixth Amendment

1:04 CV 0133                                    22

right to counsel relying on *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481

(1985).  Nonetheless, a deferential standard of review applies which liberally states, "that a state

court need not even be aware of all precedents, 'so long as neither the reasoning nor the result of

the state-court decision contradicts them.'"  *Mitchell v. Esparza*, 540 U.S. 12, 16, 124 S.Ct. 7, 10,

157 L.Ed.2d 263 (2003), quoting *Early v. Packer*, 537 U.S. 3, 7-8, 123 S.Ct. 352, 154 L.Ed.2d

263 (2000) (*per curiam*).


       The Sixth Amendment guarantees the accused, at least after the initiation of formal

charges, the right to rely on counsel as a medium between the accused and the State.  *Maine v.*

*Moulton*, 474 U.S. at 176.  The Sixth Amendment constitutional right to counsel is violated when

law enforcement officers employ a jailhouse informant to interrogate the defendant

surreptitiously.  *Id*. Although some cases turn on whether the informant actively sought

information or acted as a mere "listening post," that is not the question here.  Hutchinson admitted

that he actively questioned Ayers to get more details after meeting with the detectives.  In the *voir*

*dire* questioning, Hutchinson stated that a mere ten to fifteen minutes after being placed back into

the pod with Ayers, he started to inquire more details about the amount of money stolen and the

murder weapon.  (Tr. 823).  The question is whether Hutchinson at this point was acting on his

own initiative or as the agent of the government.


       In *Massiah v. U.S.*, the court "held that, once a defendant's Sixth Amendment right to

counsel has attached, he is denied that right when [government] agents 'deliberately elicit'

incriminating statements from him in the absence of his lawyer.'"  *Kuhlmann v. Wilson*, 477 U.S.

1:04 CV 0133                                       23

436, 457, 106 S.Ct. 2616, 2629, 9l L."Ed.2d 364 (1986), citing *Massiah*, 377 U.S. 201, 206, 84

S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964).  In *Massiah,* the informant arranged to meet the

defendant, permitted federal agents to place a radio transmitter underneath the carseat, an agent

overheard the incriminating conversation and was permitted to testify about what he had heard on

the radio.  This constituted unlawful interrogation in the absence of counsel.  *Id.*, 377 U.S. at 206.

In *Maine v. Moulton*, a similar strategy was employed when the informant accepted a plea bargain

that in return for no additional charges and his testimony against defendant on pending charges,

he permitted his telephone conversations with defendant to be recorded.  *Id.*, 474 U.S. at 163.

The informant subsequently allowed himself to be equipped with a body wire transmitter to

record conversations from this meeting defendant had requested with the informant to plan

defense strategy.  *Id.*, 474 U.S. at 164.  The State argued that this was distinguishable from

*Massiah* because defendant, not the informant, had arranged to meet.  *Id.*, 474 U.S. at 174.  The

Supreme Court was unreceptive and set out the principle that, "knowing exploitation by the State

of an opportunity to confront the accused without counsel being present is as much a breach of

the State's obligation not to circumvent the right to assistance of counsel as is the intentional

creation of such an opportunity."  *Id.*, 474 U.S. at 176.  "Thus, the Sixth Amendment is not

violated whenever – by luck or happenstance – the State obtains incriminating statements from

the accused after the right to counsel has attached."  *Id.*  However, *Moulton*'s circumstances bore

some similarity to those in *Massiah*, and particularly those in *U.S. v. Henry*, 447 U.S. 264, 100

S.Ct. 2183, 65 L.Ed.2d 115 (1980), where, "[b]y intentionally creating a situation likely to induce

[defendant] to make incriminating statements without the assistance of counsel, the Government

violated [defendant's] Sixth Amendment right to counsel."  *Moulton*, 474 U.S. at 174, quoting

1:04 CV 0133                                   24

*Henry*, 447 U.S. at 274.[9]


The U.S. Supreme Court in *Henry* set the parameters of a Sixth Amendment violation  as "involv[ing] incriminating statements made by the accused to an undisclosed and undercover Government informant while in custody and after indictment."  *Id.*, 447 U.S. at 269, 100 S.Ct. at 2186. Deliberate soliciting of incriminating statements was to be determined using the factors of: first, " [informant] was acting under instructions as a paid informant for the Government; second, [informant] was ostensibly no more than a fellow inmate; and third, [defendant] was in custody and under indictment at the time . . ." *Henry*, 447 U.S. at 270.


From *Henry* and its family of cases, the following three-part test for finding a violation of the right to counsel has been distilled: "(1) the right to counsel must have attached at the time of the alleged infringement; (2) the informant must have been acting as a 'government agent'; (3) the informant must have engaged in 'deliberate elicitation' of incriminating information from the defendant."  *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 891-92 (3rd Cir. 1999), citing *Maine v. Moulton*, 474 U.S. at 170-71; *Henry*, 447 U.S. at 269-70; and see *Massiah*, 377 U.S. at 206.  See also, *Moore v. U.S.*, 178 F.3d 994, 999 (8th Cir. 1999), *cert. denied*, 528 U.S. 943 (1999).

---

[9] The decision in *Kuhlmann v. Wilson*, followed, involving a jailhouse informant deliberately housed in close proximity to defendant, but instructed not to stimulate conversations of the crime.  *Id.*, 477 U.S. 436, 456-59, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986).  Instead of extrapolating from *Henry* and *Moulton* and prohibiting admission due to a contrived situation, the Supreme Court treated this as a happenstance situation and adopted the "listening post" exemption, which is not relevant here.  See *Kuhlmann*, 477 U.S. at 456 n. 19; *Maine v. Moulton*, 474 U.S. at 77 n. 13.

1:04 CV 0133                                        25

In Ayers' situation there is no question that the first and third requirements exist.  The

pivot point is on the second requirement whether Mr. Hutchison was a "government agent." As

explained by the Third Circuit:

> The Supreme Court has not formally defined the term "government agent"
> for Sixth Amendment purposes.  See *Depree v. Thomas*, 946 F.2d 784,
> 793-94 (11th Cir. 1991) ("There is, by necessity, no brightline rule for
> determining whether an individual is a government agent for purposes of
> the Sixth Amendment right to counsel.") In its sole case focusing on a
> determination of government agency, the Supreme Court found the
> informant was an agent because he was paid and "acting under
> instructions" from the government.  See *Henry*, 447 U.S. at 270, 100 S.Ct.
> 2183.  The Court also cited facts that the informant was ostensibly a mere
> fellow inmate rather than a trusted friend of the defendant and that the
> defendant was in custody and under indictment at the time of the alleged
> elicitation.  The Court did not attempt to generalize these factors into a rule
> defining government agency for future cases, nor has it revisited them in
> subsequent cases.

*Matteo*, 171 F.3d at 893.

Consequently, the Third Circuit found in *Matteo* that there was no rule of "sufficient specificity to

merit 'contrary to' review" under §2254(d)(1)  *Id.* This reasoning is certainly valid in Ayers'

circumstance where the Supreme Court precedent is materially distinguishable.

This leaves the "unreasonable application" prong of §2254(d)(1).  The Third Circuit in

*Matteo* created a test balancing several factors.[10]  This reasoning bears some similarity to the

---

[10] The Third Circuit required only "some evidence that an agreement, express or implied, between the
individual and a government official existed at the time the elicitation [took] place."  *Matteo*, 171 F.3d at 893.  This
evidence could include that the informant was "acting under instructions" from the government to obtain
information, a *quid-pro-quo* for assistance, or past relationship.  *Id.* at 893-94.

1:04 CV 0133                                    26

dissenting state opinion. Other circuits, on the other hand, have applied a "bright line" rule, where

"[a]n informant becomes a government agent for purposes of [*Massiah*] only when the informant

has been instructed by the police to get information about the particular defendant."  *Moore v.*

*U.S.*, 178 F.3d at 999, quoting *U.S. v. Birbal*, 113 F.3d 342, 346 (2nd Cir. 1997) (collecting cases);

and see *U.S. v. LaBare*, 191 F.3d 60, 65 (1st Cir. 1999). This bright line rule was more recently

reasserted by the Eighth Circuit in *U.S. v. Johnson*, 338 F.3d 918, 921-23 (8th Cir. 2003).  Since

the First, Second and Eighth Circuits have applied the same standard of whether the informant

was instructed by the state to obtain a confession, as the majority decision in *Ayers*, it becomes

impossible to fault the state decision as an unreasonable application of *Massiah* or its progeny.


**GROUND 4:**

> 4.  The state did not present sufficient evidence of the petitioner's guilt in
> violation of the Fifth and Fourteenth Amendments to the United States
> Constitution.

Ayers' fourth ground for relief improperly attacks the sufficiency of the evidence upon

which his conviction is based, by interpreting the evidence in a light most favorable to himself.

However, the United States Supreme Court stated that a federal tribunal on habeas corpus


reviewing the sufficiency of the evidence must evaluate the evidence in the light most favorable

to the prosecution.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).


Due Process under the Fourteenth Amendment to the  Constitution prohibits a conviction

of any person except upon proof of guilt beyond a reasonable doubt.  *In re Winship*, 397 U.S. 358,

1:04 CV 0133                                        27

362-63, 90 S. Ct. 1068, 1071-72,  25 L.Ed.2d 368 (l970).  Application of this due process

principle in habeas corpus proceedings provides that the "applicant is entitled to habeas corpus

relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could

have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 324, 99

S.Ct. at  2791-92.  In habeas review, though, the federal reviewing court must, "give[] full play to

the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence,

and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v.  Virginia*, 443

U.S. at 3l9, 99 S.Ct. at  2789.  Circumstantial evidence, "if substantial and competent, may

support a verdict and need not remove every reasonable hypothesis except that of

guilt."*McKenzie v. Smith,* 326 F.3d 721, 727 (6th Cir.2003); *Jackson*, 443 U.S. at 317 n. 9. , 99

S.Ct at 2788.  Thus, "[o]nce a defendant has been found guilty of the crime charged, the fact

finder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial

review all of the evidence is to be considered in the light most favorable to the prosecution."

*Jackson v. Virginia*, 443 U.S. at 3l9, 99 S.Ct. at 2789 (emphasis in original).  Thus, the test in

habeas corpus is "whether after viewing the evidence in the light most favorable to the

prosecution, any rational trier of fact could have found the essential elements of the crime beyond

a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 3l9, 99 S.Ct. at 2789 (emphasis in original);

*Wright v. West*, 505 U.S. 277, 112 S.Ct. 2482, 120 L.Ed.2d 225, 237 (1992). "Finally, the *Jackson*

inquiry does not focus on whether the trier of fact made the *correct* guilt or innocence

determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v.*

*Collins*, 506 U.S. 390, 402, 113 S.Ct. 853, 861, 122 L.Ed.2d 203 (1993).

1:04 CV 0133                                                        28

Ayers' argument focuses on the credibility of Hutchinson as a witness and whether specifically if the prosecution proved the elements of aggravated burglary.  In *Jackson*, the Court made it clear that the federal habeas corpus court does not sit as a trier of fact.  Instead, the federal district court should give every weight to the jury's ability to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the facts.  Therefore, the district court should only evaluate whether the jury reached a rational verdict and not determine whether Hutchinson was or was not credible.  It is the role of the jury to determine Hutchinson's credibility.

Ayers next contends that the prosecution failed to prove his guilt of every element of the crimes charged beyond a reasonable doubt.  In particular, Ayers claims that the prosecution failed to show that Ayers entered the apartment by "force, stealth or deception."  Under Ohio Revised Code Section 2911.11, aggravated burglary is defined as:

> (A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with the purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following:
> (1) The offender inflicts, or attempts or threatens to inflict physical harm on another

As a CMHA police officer Ayers had keys to all apartments, including the apartment of the victim. (Tr. 1023-1024).  Hutchinson testified that Ayers told him that he broke into Dorothy Brown's apartment early in the morning of December 17, 1999 while she was sleeping  (Tr. 1313).  During the robbery, Brown awoke and threatened to notify the police about the robbery.  *Id.* Fearing apprehension, Ayers attacked and killed Brown.  *Id.*  Ayers entering the victim's

1:04 CV 0133                                      29

apartment while she was asleep constitutes the element of stealth needed for aggravated burglary

in Ohio.

The State also found Ayers guilty of aggravated robbery.  The Ohio Revised Code under

section 2911.01 defines aggravated robbery as:

> (A) No person, in attempting or committing a theft offense, as defined in section 2913.01
> of Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the
> following:
> (3) Inflict, or attempt to inflict, serious physical harm to another.

The state appellate court found that Ayers committed theft as money was stolen from Brown's

empty handbag located inside her apartment.  *State v. Ayers*, 2002 WL 3103675, at*4.  In addition,

the assistant coroner, Dr. Frank Miller of the Cuyahoga County Coroner's Office, testified to the

extensive injuries suffered by the victim, including a fractured skull.  (Tr. 871).  Theft of  money

and physical harm clearly satisfies all the elements of aggravated robbery.

Finally, the State also proved that the evidence satisfied all the elements of aggravated

murder.  The Ohio Revised Code under section 2903.01 defines aggravated murder as:

> (A) No person shall purposely, and with prior calculation and design, cause
> the death of another or unlawful termination of another's pregnancy.
>
> (B) No person shall purposely cause the death of another or the unlawful
> termination of another's pregnancy while committing or attempting to
> commit, or while fleeing immediately after committing or attempting to
> commit, kidnaping, rape, aggravated arson, arson, aggravated robbery,
> robbery, aggravated burglary, burglary, terrorism, or escape.

1:04 CV 0133                                    30

Here, the evidence established that Ayers violated both section (A) and (B) of Ohio Rev. Code §2903.01.  The purpose and calculation under (A) for the murder of Brown can be obtained through Ayers' returning to Brown's apartment in the early hours of the morning of December 17, 1999 to steal cash.  In addition, (B) is satisfied since as noted beforehand, the murder occurred while Ayers was committing both aggravated burglary and aggravated robbery.


Therefore, for all three charges of aggravated burglary, aggravated theft, and aggravated murder there was sufficient evidence presented by the State to convict Ayers of all charges.


### *CONCLUSION AND RECOMMENDATION*

Following review of the petition and applicable law, Ayers has not demonstrated that he is in custody pursuant to judgment of a State court which was the result of a decision that was contrary to or involved the unreasonable application of Federal law as determined by the Supreme Court of the United States or was the result of a decision based on an unreasonable determination of the facts in light of the evidence in the State court proceeding.  See 28 U.S.C. §2254(d)(1) and


(2).  There has been no demonstrated need for an evidentiary hearing.  It is recommended that the petitioner's application for habeas corpus be denied.

                        s/James S. Gallas
                        United States Magistrate Judge


*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of

1:04 CV 0133                                                31

Court within ten (10) days of mailing of this notice.  Failure to file objections within the specified

time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See*, *United States v.*

*Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).

Dated: June 22, 2007